**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
July 9, 2009

No. 08-20461

Charles R. Fulbruge III
Clerk

PETROLEUM PIPE AMERICAS CORPORATION

Plaintiff-Appellee

v.

JINDAL SAW LTD

Defendant-Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before JONES, Chief Judge, and WIENER and BENAVIDES, Circuit Judges.

FORTUNATO P. BENAVIDES, Circuit Judge:

Jindal Saw, Ltd. ("Jindal") appeals the district court's denial of its motion to stay litigation and compel arbitration. We affirm.

**I**

Defendant-Appellant Jindal is a manufacturer of steel pipes based in India. Plaintiff-Appellee Petroleum Pipe Americas Corp. is a Texas-based corporation whose United Arab Emirates' affiliate, Petroleum Pipe Middle East (collectively, "PPA"), began purchasing pipe from Jindal in the fall of 2004. From November 2004 until August 2005, Jindal accepted several purchase

orders from PPA for various grades of pipe. These purchase orders do not contain arbitration clauses. PPA then supplied the pipe to third-parties, two of whom—Gunn Oil Co. ("Gunn") and Magnum Producing, LP ("Magnum")—suffered well failures allegedly caused by defective Jindal grade P110 pipe. PPA notified Jindal that PPA had reached a settlement with Gunn and Magnum conditioned on Jindal's agreement to a separate settlement with PPA. Jindal responded favorably to this offer, and, on January 9, 2006, the parties resolved the dispute by reaching a comprehensive settlement agreement ("Settlement Agreement") in which Jindal would, inter alia, pay PPA $750,000 as full settlement of all claims that Gunn and Magnum brought against PPA and give PPA a $200,000 credit on two pending purchase orders. The agreement defines "Financial Claims" as those raised by PPA against Jindal in PPA's December 2, 2005 claim letter. In turn, that claim letter describes the Gunn and Magnum claims and also specifically describes the issues with the P110 pipe, but with no other pipe. Likewise, the Settlement Agreement specifically mentions only P110 pipe.

The Settlement Agreement includes a release provision in which PPA contracted to forgo:

> any claim against the claimed rejection in [PPA's] Internal Inspection carried out on any other material bought by [PPA] from [Jindal]. This clause relates only to the material received up to 12th December 2005. PPA reserves the right to bring claims for claimed rejection in respect of material received after this date.

Additionally, the parties' meeting minutes from the discussions surrounding the Settlement Agreement state that the Settlement Agreement "forms as the full and final settlement of the claims on P110 products supplied so far to [PPA], as on date." The parties dispute whether the release agreement applies to claims

2

for all defective pipe received before December 12, 2005, or only P110 pipe received before that date.

The Settlement Agreement includes an arbitration clause whereby:

> The parties agree to have the dispute if any to have the same arbitrated [*sic*] than litigated. All disputes arising in connection with the present contract shall be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce by a Sole Arbitrator . . . . The law governing the contract and the arbitration procedure shall be English law. The place of arbitration shall be London.

On May 30, 2007, PPA sent Jindal a demand letter alleging that Jindal sold PPA defective L80 and N80 pipe. On that same day, PPA filed the instant lawsuit in Texas state court seeking damages of $2.46 million for breach of contract and breach of warranty based on the allegedly defective L80 and N80 pipe, but not any P110 pipe. PPA has disclaimed any intention to seek damages for L80 and N80 pipe that was inspected and rejected before December 12, 2005. On July 9, 2007, Jindal removed this case to the District Court for the Southern District of Texas. A week later, Jindal filed an answer and counterclaim. In its counterclaim, Jindal alleges that PPA failed to fulfill what Jindal views as PPA's obligations under the Settlement Agreement, including PPA's alleged agreement to purchase an additional 6,000 metric tons of pipe from Jindal. Jindal asserts four causes of action related to PPA's performance under the Settlement Agreement: (1) breach of the Settlement Agreement and purchase orders, (2) unjust enrichment or restitution for the amount Jindal paid to PPA under the Settlement Agreement, (3) promissory estoppel, and (4) money had and received.

The parties then exchanged documents and, at the district court's urging, discussed settlement and kept the judge updated regarding settlement

3

discussions. The district court held a series of off-the-record conferences in chambers over the next several months. On November 15, 2007, the parties submitted a joint status report stating that at the October 29, 2007, status conference, the parties had agreed "that in the event that settlement was unlikely, that they could narrow the issues in the case to several discrete legal issues requiring rulings from the Court." Following another conference on March 12, 2008, the parties jointly filed their respective interpretations of the Settlement Agreement, neither of which mentioned the arbitration provision. Then, according to PPA, the district court, in a May 19, 2008, off-the-record conference, interpreted the Settlement Agreement in a manner contrary to Jindal's interests. Jindal characterizes this conference as an informal discussion in which the district court "expressed concern" over Jindal's interpretation, and denies that any rulings were made.

On May 29, 2008, ten days after that conference and a year after PPA originally filed suit, Jindal moved to stay the litigation and compel arbitration. PPA objected on two grounds: (1) that the claims did not fall within the scope of the arbitration clause of the Settlement Agreement, and (2) that even if the parties had agreed to arbitrate the claims, Jindal waived that right by substantially invoking the judicial process. The district court summarily denied Jindal's motion to stay and to compel arbitration. Jindal timely filed a notice of appeal.

## II

Because Jindal seeks review of an order refusing to stay the proceedings and compel arbitration, we have jurisdiction over this interlocutory appeal. *See Republic Ins. Co. v. PAICO Receivables, LLC*, 383 F.3d 341, 344 (5th Cir. 2004). This court reviews *de novo* a district court's denial of a motion to stay litigation

and to compel arbitration. *See Pennzoil Exploration & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1065 (5th Cir. 1998).[1]

### III

Even assuming *arguendo* that the parties agreed to arbitrate their dispute, Jindal has waived its right to compel arbitration. "The question of what constitutes a waiver of the right of arbitration depends on the facts of each case . . . ." *Walker v. J.C. Bradford & Co.*, 938 F.2d 575, 576 (5th Cir. 1991) (citation omitted). The court finds waiver "when the party seeking arbitration substantially invokes the judicial process to the detriment or prejudice of the other party."[2] *Id.* at 577 (citation omitted). In this context, "prejudice" means "the inherent unfairness in terms of delay, expense, or damage to a party's legal position that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate the same issue." *Republic*, 383 F.3d at 346 (citation omitted). And, "[t]hree factors are particularly relevant" to the prejudice determination: (1) whether discovery occurred relating to arbitrable claims; (2)

---

[1] We typically review for clear error the district court's factual findings underlying its determination whether a party waived its right to arbitrate. *Sherer v. Green Tree Servicing LLC*, 548 F.3d 379, 381 (5th Cir. 2008) (per curiam). Since the district court made no factual findings on the waiver issue, however, there are none to review for clear error.

[2] Although the waiver standard involves two prongs of analysis (substantial invocation of the judicial process and prejudice) our precedent has recognized some overlap:

> When one party reveals a disinclination to resort to arbitration on any phase of suit involving all parties, those parties are prejudiced by being forced to bear the expenses of a trial . . . [.] Arbitration is designed to avoid this very expense. Substantially invoking the litigation machinery qualifies as the kind of prejudice . . . that is the essence of waiver.

*Price v. Drexel Burnham Lambert, Inc.*, 791 F.2d 1156, 1158 (5th Cir. 1986) (quoting *E.C. Ernst, Inc. v. Manhattan Constr. Co. of Tex.*, 559 F.2d 268, 269 (5th Cir. 1977)).

the time and expense incurred in defending against a motion for summary judgment; and (3) a party's failure to timely assert its right to arbitrate. *Id.*

To invoke the judicial process, a party "must, at the very least, engage in some overt act in court that evinces a desire to resolve the arbitrable dispute through litigation rather than arbitration." *Id.* at 344 (citation omitted). A presumption against waiver exists such that the party asserting waiver "bears a heavy burden of proof in its quest to show" waiver. *Id.* at 344 (citation omitted). And, "[w]hile the mere failure to assert the right of arbitration does not alone translate into a waiver of that right . . . such failure does bear on the question of prejudice, and may, along with other considerations, require a court to conclude that waiver has occurred." *Price v. Drexel Burnham Lambert, Inc.*, 791 F.2d 1156, 1161 (5th Cir. 1986). A party waives arbitration by seeking a decision on the merits before attempting to arbitrate. *See Miller Brewing Co. v. Ft. Worth Distributing Co.*, 781 F.2d 494, 498 (5th Cir. 1986) ("Any attempt to go to the merits and to retain still the right to arbitration is clearly impermissible." (quotation omitted)).

In this case, PPA argues that Jindal's actions demonstrate a desire to litigate rather than arbitrate, stating that, before seeking to compel arbitration, Jindal: (1) delayed seeking arbitration until a year after PPA filed suit; (2) removed the case to federal court; (3) filed counterclaims that relate to the Settlement Agreement; (4) participated in discovery and numerous discovery meetings; and (5) sought a ruling from the district court on the interpretation of the Settlement Agreement. According to PPA, Jindal sought to compel arbitration in an attempt to avoid the district court's anticipated unfavorable interpretation of the Agreement.

Jindal does not contest that it took the first four actions cited by PPA but

6

contends that they do not support a waiver finding. Jindal denies, however, that it sought any merits ruling from the district court or that any "substantive decisions" took place, and contends that the district court merely "expressed concern" about Jindal's interpretation as part of an "informal[] discuss[ion]." PPA argues (1) that the parties anticipated rulings when they stated that "in the even that settlement was unlikely, . . . they could narrow the issues in the case to several discrete legal issues requiring rulings from the Court" and subsequently filed their competing contract interpretations, and (2) that Jindal agreed that the court issued rulings as demonstrated by the parties' July 16, 2008, joint status report, which states, in part, "PPA believes obtaining a written order of [the district court's] prior verbal rulings is necessary . . . ." Jindal responds that no rulings were ever actually requested, and that the July 16, 2008 status report reflects the belief of PPA—not Jindal—that oral rulings had been made. Further, Jindal maintains, whatever the district court may have intended during the May 19, 2008, conference, it did not make any legally binding orders or rulings.

From our review of the record, it appears that Jindal is correct that the district court issued no legally binding orders or rulings at the May 19, 2008 conference; indeed, the only ruling indicated in the conference memorandum is "The parties will talk." Nonetheless, the transcript of the September 29, 2008, status conference[3] (with which Jindal supplemented the record when it filed its reply brief) makes clear, despite the district court's imperfect memory of the May 19 conference, that the district court at that conference gave very strong indications that he favored PPA's interpretation and that it was reluctant to

_____

[3] This conference took place after PPA had filed its brief in this interlocutory appeal.

consider further argument. For example, at the September 29 conference, in response to Jindal's counsel's statement that "We didn't ask the Court informally for a ruling. We asked for the court to consider it, and that was per the Court's instruction to us," the district court responded, "Right. We discussed it. I said it was not ambiguous, and it was this; and then we were going to need to document it. . . ."[4] Moreover, when addressing Jindal's counsel earlier in the September 29 conference, the district court stated, "What's the other argument [that would require further briefing]? I didn't buy the best ones, if that's what you told me you gave me last time," and shortly thereafter added, "If I had had a reporter, I would have said orally move and respond; but I didn't, and so we needed a record."

The district court's own characterization of the May 29 conference leaves

---

[4] This was part of a wider exchange, which is also illuminating:

PPA'S COUNSEL: [Y]ou read the contract and gave us your interpretation of what those problems were at issue then. . . . And I think one of the issues we are writing [*sic*] into on appeal is because it's not reduced to writing in the record and it's a little bit difficult—I think there is enough of the record to reflect that these things occurred and that you weighed in on these issues, but that's—
THE DISTRICT COURT: Well, give it to me. Give me your response and I will say what I said. But if you have got another six or seven arguments, just file your motion . . . . [Jindal's counsel will] respond . . . and then I will look at any arguments that I cited last time.
     I don't want to keep recycling. A motion to [*sic*] rehearing is fine. . . . [B]ut just rehashing the same argument doesn't get us anywhere. . . .
JINDAL'S COUNSEL: I guess that's what the issue is, Judge. It was our understanding, and we submitted, we did a joint submission for consideration with the Court. We didn't ask the Court informally for a ruling. We asked for the court to consider it, and that was per the Court's instruction to us.
THE DISTRICT COURT: Right. We discussed it. I said it was not ambiguous, and it was this; and then we were going to need to document it. . . .
JINDAL'S COUNSEL: Okay.

us firmly convinced that the district court gave a very clear indication at that conference that it had considered the parties' arguments and intended to rule against Jindal's interpretation of the Settlement Agreement. The lack of a formal ruling does not convince us that Jindal, having learned that the district court was not receptive to its arguments, should be allowed a second bite at the apple through arbitration. *See Miller Brewing Co.*, 781 F.2d at 498; *see also Khan v. Parsons Global Servs.*, 521 F.3d 421, 427 (D.C. Cir. 2008) (rejecting approach that would "encourage parties to attempt repeat litigation of merits issues not resolved to their satisfaction, undermining the policy that arbitration may not be used as a strategy to manipulate the legal process." (quotations omitted)), *Kramer v. Hammond,* 943 F.2d 176, 179 (2d Cir. 1991) ("Prejudice can be substantive, such as when a party loses a motion on the merits and then attempts, in effect, to relitigate the issue by invoking arbitration . . . ."); *cf. Cargill Ferrous Int'l v. Sea Phoenix MV*, 325 F.3d 695, 701 (5th Cir. 2003) ("Under the facts of this case, it is clear Serene is not gaming the system by seeking a win at trial, and in the case of a loss, anticipating a second bite at the apple through arbitration. Rather, Serene has preferred arbitration since the time Cargill filed its complaint."). Nor does it matter that Jindal contends that it did not seek a ruling—it knew, or should have known, that a decision on the merits was reasonably likely once settlement negotiations reached a standstill and the parties submitted their competing interpretations of the Settlement Agreement. We conclude that Jindal substantially invoked the judicial process by waiting to move to arbitrate until the district court's pronouncements in the May 19 conference and that PPA was prejudiced thereby. As that constituted waiver of Jindal's putative right to invoke arbitration, we need not consider whether Jindal's other actions constitute waiver.

9

**IV**

For the foregoing reasons, the district court's refusal to stay litigation and compel arbitration is AFFIRMED.