ACCEPTED
04-15-00469-CV
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
10/5/2015 6:25:56 PM
KEITH HOTTLE
CLERK

## NO. 04-15-00469-CV

IN THE FOURTH COURT OF APPEALS
AT SAN ANTONIO, TEXAS

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
10/5/2015 6:25:56 PM
KEITH E. HOTTLE
Clerk

## CASH BIZ, LP, CASH ZONE, LLC
## D/B/A CASH BIZ and REDWOOD FINANCIALS, LLC

*Appellants.*

v.

## HIAWATHA HENRY, ADDIE HARRIS, MONTRAY NORRIS, and ROOSEVELT COLEMAN, JR., on behalf of themselves and for all other similarly situated

*Appellees.*

From the 224th Judicial District Court for
Bexar County, Texas, No. 2015-CI-01545

## APPELLEES' RESPONSE BRIEF

HANSZEN LAPORTE
Daniel R. Dutko
State Bar No. 24054206
ddutko@hanszenlaporte.com

11767 Katy Freeway, Suite 850
Houston, Texas 77079
Telephone: (713) 522-9444
Facsimile: (713) 524-2850

## COUNSEL FOR APPELLEES

## ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

Table of Contents..................................................................................... ii

Index of Authorities............................................................................... iii

Statement of the Case ...............................................................................1

Statement of Facts....................................................................................2

Summary of the Argument .......................................................................5

Issues Presented ......................................................................................6

ARGUMENT..............................................................................................7

    Issue 1:  Standard of Review.................................................................7

    Issue 2:  Cash Biz Failed to Meet its Burden and Prove the Claims
              Asserted are Within the Scope of the Agreement ......................7

    Issue 3:  Cash Biz Waived its Right to Arbitration and Class Action
              Waiver by Substantially Invoking the Judicial Process When it
              Filed Criminal Charges, Participated in the Criminal
              Prosecutions, and Caused its Customers to be Arrested and
              Even Jailed .......................................................................... 13

              A. Cash Biz Refuses to Accept Responsibility for
                 its Illegal Activities Until it is Forced to Admit
                 Responsibility                               23

              B. There is Texas Case Law Supporting Waiver        29

              C. Cash Biz's Illegal Activities Prejudiced Appellees     34

PRAYER.................................................................................................. 34

CERTIFICATE OF COMPLIANCE............................................................ 36

CERTIFICATE OF SERVICE .................................................................... 36

# INDEX OF AUTHORITIES

## <u>CASES</u>

**Page**

*Adams v. StaxxRing, Inc.,*
344 S.W.3d 641, 647 (Tex. App.—Dallas 2011, pet. denied) ...................... 13

*Browning-Ferris Indus., Inc. v. Lieck*,
881 S.W.2d 288, 293 (Tex. 1994) ......................................................... 28,29

*Consorcio Rive, S.A. de C.V. v. Briggs Of Cancun, Inc.,*
134 F. Supp. 2d 789, 795 (E.D. La. 2001) ................................................... 31

*Ellman v. JC Gen. Contractors*,
419 S.W.3d 516, 519 (Tex. App.—El Paso 2013, no pet.)............................8

*Griffin v. Burlington Volkswagen, Inc.,*
*411 N.J. Super.* 515, 517, 988 A.2d 101, 102 (App. Div. 2010) ................. 31

*Haddock v. Quinn,*
287 S.W.3d 158, 177 (Tex.App.-Fort Worth 2009, pet. denied) ................. 14

*Holmes, Woods & Diggs v. Gentry*,
333 S.W.3d 650, 653 (Tex. App.—Dallas 2009, no pet.)....................... 15,16

*Inland Sea, Inc. v. Castro*,
420 S.W.3d 55, 57–58 (Tex.App.-El Paso 2012, pet. Denied)......................8

*In re AdvancePCS Health L.P.*,
172 S.W.3d 603 (Tex.2005) ................................................................... 7,8

*In re Bunzl USA, Inc.,*
155 S.W.3d 202, 209 (Tex. App.—El Paso 2004, orig. proceeding) ............9

*In re Conseco Fin. Servicing Corp.,*
19 S.W.3d 562, 570 (Tex. App.—Waco 2000, no pet.)......................... 10,11

*In re Christus Spohn Health Sys. Corp.*,
231 S.W.3d 475, 481 (Tex. App.—Corpus Christi 2007, no pet.) ............. 30

*In re Jebbia*,
26 S.W.3d 753 (Tex. App.—Houston [14th Dist.] 2000, orig. proc.) ...........9

*In re Labatt Food Serv., L.P.,*
279 S.W.3d 640 (Tex. 2009) ...............................................................7

*In re Online Travel Co.,*
953 F. Supp. 2d 713, 721 (N.D. Tex. 2013)................................... 23

*In re Ruefer,*
1999 Tex. App. LEXIS 4275 (Tex. App. Amarillo June 8, 1999)............... 10

*In re Service Corp. Int'l,*
85 S.W.3d 171 (2002)..................................................... 13

*Jack B. Anglin Co. Inc. v. Tipps,*
842 S.W.2d 266 (Tex. 1992) ................................................. 10,12

*McReynolds v. Elston,*
222 S.W.3d 731 (Tex. App.—Houston [14th Dist.] 2007, no pet.)............. 11

*Perry Homes v. Cull,*
258 S.W.3d 580 (Tex. 2008) ................................................. 13,22

*Petroleum Pipe Americas Corp. v. Jindal Saw, Ltd.,*
575 F.3d 476 (5th Cir. 2009) ............................................... 16,18

*Pilot Travel Centers, LLC v. McCray,*
416 S.W.3d 168, 183 (Tex. App.—Dallas 2013, no pet.)....................... 22,23

*Prescott-Follett & Associates, Inc. v. Delasa/Prescott Follett & Associates,*
CIV.A. 01-3178, 2002 WL 31528463 (E.D. La. Nov. 8, 2002) ........ 32,33,34

*Southwind Group, Inc. v. Landwehr,*
188 S.W.3d 730 (Tex. App. –Eastland 2006, orig. proceeding).................. 34

*Tuscan Builders, LP v. 1437 SH6 L.L.C.,*
438 S.W.3d 717 (Tex. App.—Houston [1st Dist.] 2014 review denied) .... 14

*Valero Energy Corp. v. Wagner & Brown,*
777 S.W.2d 564 (Tex. App.--El Paso 1989, writ denied) ...................... 10,13

*Williams Indus. Inc. v. Earth Development Sys. Corp.,*
110 S.W.3d 131 (Tex. App. –Houston [1st Dist.] 2003, no pet.) ... 6,13,18,21

iv

# **STATUTES**

Tex. Const. Art. 1 Sec. 18..............................................................................8

Tex. Fin. Code § 393.201(c)...........................................................................8

Tex. Fin. Code § 392.301 ...............................................................................8

Tex. R. Evid. 103 ..........................................................................................19

## STATEMENT OF THE CASE

The Statement of the Case of Cash Biz LP, Cash Zone, LLC d/b/a Cash Biz and Redwood Financials, LLC (hereinafter "Cash Biz") contains one important inaccuracy. Cash Biz claims "After the Appellees defaulted on the repayment obligations under their respective Loan Contracts, Cash Biz conducted separate investigations that, in each instance, uncovered information that led Cash Biz to believe that each Appellee had engaged in separate, specific criminal acts during the formation and performances of their respective Loan Contracts." This is false because all Appellees did was fail to repay a civil debt. Cash Biz was the one illegally using criminal courts to collect civil debts. Cash Biz was the one who "engaged in separate, specific criminal acts" as evidenced by the fact the Texas Office of Consumer Credit Commissioner ("OCCC") ordered Cash Biz to pay $10,000 in fines, and during the investigation, Cash Biz admitted it improperly subjected its customers to criminal prosecution for failure to repay civil obligations. (CR, 140-141, Appendix 1).

# STATEMENT OF FACTS

In 2012, numerous consumers in Texas began reporting that Cash Biz, and other payday loan companies, were illegally filing criminal charges against its customers to collect on civil debts. (CR, 151-159). Texas Appleseed and the Texas Observer separately began investigating these allegations. (CR, 151-159).

Texas Appleseed is a nonprofit, nonpartisan organization that works to provide justice for children, low-income families, and those with disabilities. (CR, 151-159). Texas Appleseed learned Cash Biz was illegally filing criminal complaints against low-income people to collect on civil debts. (CR, 151-159). Texas Appleseed submitted open records requests to state regulators and several district attorneys. (CR, 151-159).

On December 17, 2014, Texas Appleseed concluded its investigation and found more than 1,500 cases where payday loan companies, primarily Cash Biz, was criminally charging people to further the collection of civil debts by misclassifying the cases as bad check cases. (CR, 151-159).

Texas Appleseed learned that not only was Cash Biz using criminal courts to collect civil debts, they were forcing people to pay fines and even sending people to jail. (CR, 151-159). For example, in one justice court, where more detailed data was available, arrest warrants were issued in 42%

of the cases brought based on payday loan business complaints, and jail time or jail credit applied in 5.6% of the cases. (CR, 151-159). In another court, $131,836 was collected from 204 individuals, representing just 28% of the complaints. (CR, 151-159). In another court, payment of $918.91 was ordered on a bad check case for a defaulted $225 payday loan and a warrant was issued for her arrest. (CR, 151-159).

Separately, the Texas Observer discovered Cash Biz wrongfully filed criminal charges against thousands of people in Houston, San Antonio, and Amarillo. (CR, 140-141, Appendix 2). One such person was Christina McHan, who failed to repay a $200 loan from Cash Biz near Houston. (CR, 140-141, Appendix 2). In November 2012 she was arrested, assessed $305 in additional fines and court costs and spent a night in jail because of Cash Biz's false allegation of check fraud. (CR, 140-141, Appendix 2).

Belinda Cinque ("Cinque"), the clerk for Justice of the Peace Tom Lawrence in Humble, Texas, discovered Cash Biz was improperly using the Court system to collect on civil debts by claiming the debts were bad checks. (CR, 140-141, Appendix 2). Cinque discovered the vast majority of borrowers had either lost their jobs or had their hours reduced at work and was quoted as saying: "Correct me if I'm wrong, but they sound like sharks." (CR, 140-141, Appendix 2). Cinque told the Observer she started

getting calls from people, some in tears, making payments to Cash Biz through the court. (CR, 140-141, Appendix 2). She learned Cash Biz was "threatening them that they were going to be taken to jail." (CR, 140-141, Appendix 2). When she found all of this out, she told Cash Biz to stop filing hot-check complaints. (CR, 140-141, Appendix 2).

In response to these investigations, the Texas Office of Consumer Credit Commissioner ("OCCC) ordered Cash Biz to pay $10,000 in fines. Cash Biz admitted it improperly subjected its customers to criminal prosecution for failure to repay civil obligations. (CR, 140-141, Appendix 1). Eamon Briggs, assistant general counsel with the OCCC, said they inform payday loan companies, such as Cash Biz, it is illegal to use the criminal justice system to collect civil debt and ask these companies whether they rely on the criminal justice system to collect civil debt. (CR, 140-141, Appendix 1). But according to Eamon Briggs "people don't always answer that question during the examination process truthfully." (CR, 140-141, Appendix 1). Because of these companies' blatant dishonesty, the OCCC relies largely on consumer complaints, journalists, and information supplied by consumer advocacy groups like Texas Appleseed to catch violations. (CR, 140-141, Appendix 1).

Appellees filed this class action lawsuit against Cash Biz for malicious prosecution and Cash Biz filed a motion to compel arbitration. The arbitration clauses relied on by Cash Biz were written and insisted upon by Cash Biz. (CR, 80-130). The arbitration agreement says all "disputes" are to be resolved in arbitration and this includes "all federal or state law claims", including all disputes in criminal court. (CR, 85, RR, 13, lines 2-10).

When Cash Biz filed criminal charges, participated in the criminal trials, threatened to send its customers to jail, and actually sent its customers to jail; it was solely in an attempt to collect on the debts owed to them under the terms of the contracts.

## SUMMARY OF THE ARGUMENT

Appellees are **not** suing on the contract. The allegations in this case relate solely to Cash Biz's illegal use of the criminal justice system to enforce a civil debt. Cash Biz's illegal use of the criminal justice system occurred **after** the expiration of any contracts entered into by Appellees. All of the damages are solely related to criminal fines, jail time, and loss of reputation suffered by Appellees' criminal convictions. The law is very clear the arbitration clause and class action waiver relied on by Cash Biz are

not applicable in this case and Cash Biz's request to enforce the arbitration clauses and class-action waivers should be denied.

Cash Biz waived its right to arbitration by substantially invoking the judicial process when it filed criminal charges against Appellees, participated in criminal trials, obtained criminal judgments, threatened to send people to jail, sent people to jail, and attempted to collect from Appellees. The law is clear that substantially invoking the judicial process can occur when the proponent of arbitration actively tried to achieve a satisfactory result in litigation before turning to arbitration. *Williams Indus. Inc. v. Earth Development Sys. Corp.*, 110 S.W.3d 131, 139-40 (Tex. App. – Houston [1st Dist.] 2003, no pet.). That is exactly what Cash Biz did in the criminal courts, and has thus waived its right to enforce the arbitration clause and class actions waiver. *Id*.

## ISSUES PRESENTED

1. Did Cash Biz meet its burden and prove the claims asserted by Appellees are within the scope of the agreement even though the claims are only based on Cash Biz's wrongful prosecution in criminal courts?

2. Did Cash Biz waived its right to arbitration by substantially invoking the judicial process when it filed criminal charges against Appellees, participated in criminal trials, obtained criminal judgments, threatened to send people to jail, sent people to jail, and attempted to collect from Appellees even though the contract stated that all claims, whether civil or criminal, are required to be arbitrated?

6

## ARGUMENT

### Issue 1 – The Standard of Review

This Court should review a ruling denying a motion to compel arbitration for an abuse of discretion. *Perry Homes v. Cull*, 258 S.W.3d 580, 601 (Tex. 2008). Under this standard, this Court should defer to the Trial Court's factual determinations if they are supported by the evidence and review its legal determinations *de novo*. *In re Labatt Food Serv., L.P.,* 279 S.W.3d 640, 643 (Tex. 2009).

The issues regarding whether the claims asserted are within the scope of the agreement and whether Cash Biz waived its right to assert the arbitration and class action waiver are to be reviewed *de novo*. *See Perry Homes*, 258 S.W.3d at 598. However, the factual determinations of the Trail Court regarding Cash Biz's amount of participation in the criminal prosecutions should be reviewed pursuant to the abuse of discretion standard. *See Perry Homes*, 258 S.W.3d at 643.

### Issue 2 – Cash Biz Failed to Meet its Burden and Prove the Claims Asserted are Within the Scope of the Agreement.

A party seeking to compel arbitration must (1) establish the existence of a valid arbitration agreement; and (2) show that the claims asserted are within the scope of the agreement. *See In re AdvancePCS Health L.P.*, 172

S.W.3d 603, 605 (Tex.2005); *Inland Sea, Inc. v. Castro*, 420 S.W.3d 55, 57–58, 2012 WL 1715242 at \*2 (Tex.App.-El Paso 2012, pet. denied). Only after these two showings are made does the burden shift to the party resisting arbitration to present a valid defense to the agreement. *See In re AdvancePCS*, 172 S.W.3d at 607; *Ellman v. JC Gen. Contractors*, 419 S.W.3d 516, 519 (Tex. App.—El Paso 2013, no pet.).

The reason why Cash Biz is pushing arbitration in this case is because there is no dispute Cash Biz's actions violated Texas law and the Texas Constitution. The Texas Bill of Rights in the Texas Constitution states: "No person shall ever be imprisoned for debt." *See* Tex. Const. Art. 1 Sec. 18. Texas Finance Code, Section 393.201(c) states: "...a person may not threaten or pursue criminal charges against a consumer related to a check or other debit authorization provided by the consumer as security for a transaction in the absence of forgery, fraud, theft, or other criminal conduct." *See* Tex. Fin. Code § 393.201(c). Texas Finance Code, Section 392.301 is entitled "THREATS OR COERCION" and states: "(a) In debt collection, a debt collector may not use threats, coercion, or attempts to coerce that employ any of the following practices:..(2) accusing falsely or threatening to accuse falsely a person of fraud or any other crime." *See* Tex. Fin. Code § 392.301.

In this case, Cash Biz put people in jail, threatened criminal charges, and falsely accused people of a crime. (CR, 151-159). Cash Biz violated the Texas Constitution and Section 393.201(c) and 392.301 of the Texas Finance Code. *See* Tex. Const. Art. 1 Sec. 18; Tex. Fin. Code § 393.201(c); Tex. Fin. Code § 392.301.

All of the claims made by Plaintiffs in this case relate solely to Cash Biz's illegal use of the criminal justice system to enforce a civil debt. (CR, 15-26). Cash Biz's illegal use of the criminal justice system occurred **after** the expiration of any contracts entered into by Plaintiffs and all of the damages are solely related to criminal fines, jail time, and loss of reputation related to Plaintiffs' criminal convictions. (CR, 15-26). Plaintiffs did not sue for breach of contract or for any relief under the contract. (CR, 15-26).

In deciding whether the parties have agreed to arbitrate, the courts do not resolve doubts or indulge a presumption in favor of arbitration. *In re Bunzl USA, Inc.,* 155 S.W.3d 202, 209 (Tex. App.—El Paso 2004, orig. proceeding); *In re Jebbia*, 26 S.W.3d 753, 757 (Tex. App.—Houston [14th Dist.] 2000, orig. proceeding).

The arbitration clause and class action waiver in this case can only be enforced against Appellees if this Court determines Appellees claims are so interwoven with the agreements that they could not stand alone,. *See Jack B.*

*Anglin Co. Inc. v. Tipps*, 842 S.W.2d 266, 271 (Tex. 1992); *Valero Energy Corp. v. Wagner & Brown*, 777 S.W.2d 564, 567 (Tex. App.--El Paso 1989, writ denied); *In re Ruefer*, 1999 Tex. App. LEXIS 4275 (Tex. App. Amarillo June 8, 1999). If Appellees' claims are independent of the agreements and could be maintained without reference to the agreements, then arbitration is improper and the class action waiver does not apply. *Id*. The arbitration clause and class action waiver must be "inextricably intertwined" with the contract in order for this Court to grant Cash Biz's request to compel arbitration and enforce the class action waiver. *Id*.

Appellees' claims are based solely on Cash Biz's wrongful criminal prosecution of Appellees, and Cash Biz's illegal use of the criminal justice system to punish Appellees for a civil debt. (CR, 15-26). The only link to the contract is the fact the civil debt stems from the contract, nothing else. This is not "inextricably intertwined" as set forth by Texas law. *See Jack B. Anglin Co. Inc. v. Tipps*, 842 S.W.2d 266, 271 (Tex. 1992); *Valero Energy Corp. v. Wagner & Brown*, 777 S.W.2d 564, 567 (Tex. App.--El Paso 1989, writ denied); *In re Ruefer*, 1999 Tex. App. LEXIS 4275 (Tex. App. Amarillo June 8, 1999).

Appellants' reliance on *In re Conseco*, shows their confusion regarding the facts in this case. The Plaintiffs in *In re Conseco*, filed suit

against Conseco based solely on violations of the Debt Collection Act and Conseco's alleged improper efforts to collect the amounts due under the terms of the agreement. *In re Conseco Fin. Servicing Corp.,* 19 S.W.3d 562, 570 (Tex. App.—Waco 2000, no pet.).

This case is easily distinguishable from *In re Conseco*, because in this case Appellees' claims are not based on Cash Biz's actually collecting the debt owed. Appellees did not file suit under the Debt Collect Act or based on Cash Biz's improper and illegal collection of the debts owed. This case is based solely on Cash Biz's wrongful criminal prosecution of Appellees. (CR, 15-26). It is true Cash Biz wrongfully tried to collect on the debts owed by criminally threatening and prosecuting its customers. However, Appellees did not sue for improper debt collection, like the Plaintiffs in *In re Conseco*. Instead, Appellees sued for malicious and wrongful criminal prosecution.

When determining whether a claim is within the scope of an arbitration agreement, courts focus on the factual allegations of the complaint rather than the legal causes of action asserted. *McReynolds v. Elston*, 222 S.W.3d 731, 740 (Tex. App.—Houston [14th Dist.] 2007, no pet.). In this case, the factual allegations are exclusively related to Cash Biz's wrongful prosecution of Appellees, not Cash Biz's improper

11

collection of the debt. (CR, 15-26). Appellees did not allege breach of contract, and Appellees pleadings do not even contain the words "contract" or agreement". (CR, 15-26). There is no dispute that Cash Biz improperly filed criminal charges to collect a civil debt. However, none of Appellees' claims relate to, or arise from, the collection of the civil debt. (CR, 15-26). Instead, Appellees claims relate solely to the malicious prosecution of Appellees and the damages sustained as a result of the malicious prosecution. (CR, 15-26).

In fact, when the trial court looked at all the evidence presented, including Appellees' pleadings, it determined:

> . . . the allegations in this case relate solely to Cash Biz's illegal use of the criminal justice system to enforce a civil debt. Cash Biz's illegal use of the criminal justice system occurred after the expiration of any contracts entered into by Plaintiffs and all of the damages are solely related to criminal fines, jail time, and loss of reputation related to Plaintiffs' criminal convictions. Therefore, the arbitration clauses and class action waivers relied on by Cash Biz are not applicable . . .

It is clear Cash Biz did not meet its burden to prove that Appellees' claims fall within the scope of the agreements because Appellees' claims are independent of the agreements. Therefore, Cash Biz's Motion to Compel Arbitration was properly denied. *See Jack B. Anglin Co. Inc. v. Tipps*, 842

12

S.W.2d 266, 271 (Tex. 1992); *Valero Energy Corp. v. Wagner & Brown*, 777 S.W.2d 564, 567 (Tex. App.--El Paso 1989, writ denied); *In re Ruefer*, 1999 Tex. App. LEXIS 4275 (Tex. App. Amarillo June 8, 1999).

The evidence and pleadings in this case show that the trial court was correct and her order should be affirmed. Appellees respectfully request this court affirm the trial court's order and holdings.

**Issue 3 – Cash Biz Waived its Right to Arbitration and Class Action Waiver by Substantially Invoking the Judicial Process When it Filed Criminal Charges, Participated in the Criminal Prosecutions, and Caused its Customers to be Arrested and Even Jailed**

A party waives its right to enforce an arbitration clause if "it has substantially invoked the judicial process to the opponent's detriment." *In re Service Corp. Int'l*, 85 S.W.3d 171 (2002). Substantially invoking the judicial process can occur "when the proponent of arbitration actively tried, but failed, to achieve a satisfactory result in litigation before turning to arbitration." *Williams Indus. Inc. v. Earth Development Sys. Corp.*, 110 S.W.3d 131, 139-40 (Tex. App. –Houston [1st Dist.] 2003, no pet.).

Waiver is determined by reviewing the totality of the circumstances on a case-by-case basis. *See Perry Homes*, 258 S.W.3d at 591; *Adams v. StaxxRing, Inc.*, 344 S.W.3d 641, 647 (Tex. App.—Dallas 2011, pet. denied). For a waiver to have occurred, the appellant "must, at the very

13

least, [have] engage[d] in some overt act in court that evince[d] a desire to resolve the [same] arbitrable dispute through litigation rather than arbitration." *Tuscan Builders, LP v. 1437 SH6 L.L.C.*, 438 S.W.3d 717, 721 (Tex. App.—Houston [1st Dist.] 2014 review denied); *Haddock v. Quinn*, 287 S.W.3d 158, 177 (Tex.App.-Fort Worth 2009, pet. denied).

The arbitration clause was written and insisted upon by Cash Biz. (CR, 80-130). The arbitration agreement says all "disputes" are to be resolved in arbitration and this includes "all federal or state law claims." (CR, 85). As counsel for Cash Biz admitted during the oral hearing on Cash Biz's Motion to Compel Arbitration, Cash Biz was required to arbitrate before engaging in any disputes including any disputes in criminal court:

> THE COURT: But that agreement is for both sides, no?
>
> MR. ARORA: Yes. This agreement is for – this agreement is executed and is agreed to by both parties, the plaintiffs and Cash Biz.
>
> THE COURT: So all federal or state laws, including criminal law.
>
> MR. ARORA: All. All of it, your Honor, is included in this arbitration provision.

(RR, 13, lines 2-10).

14

Cash Biz filed criminal charges, participated in criminal trials, threatened to send its customers to jail, and even sent its customers to jail in an attempt to collect on the debts owed to them. There can be no doubt Cash Biz was seeking a decision on the merits before attempting to arbitrate.

In *Holmes Woods & Diggs*, a similar case, a law firm was not paid by Gentry, one of its clients. *Holmes, Woods & Diggs v. Gentry*, 333 S.W.3d 650, 653 (Tex. App.—Dallas 2009, no pet.). The law firm filed suit to collect unpaid fees, served Gentry with the lawsuit, and when Gentry failed to file an answer, the law firm obtained a default judgment. The law firm then attempted to execute on its judgment and Gentry filed a bill of review. The bill of review was granted and the case was put back on the trial docket. At that point, the law firm filed a motion to compel arbitration. The trial court ruled the law firm substantially invoked the judicial process and thus waived its right to enforce the arbitration provision. The Dallas Court of Appeals affirmed and held that the law firm substantially invoked the judicial process even though very little discovery was conducted in the underlying case. *Id*. at 653. The Court held the law firm should not be allowed "purposefully and unjustifiably manipulate the exercise of its arbitral rights simply to gain an unfair tactical advantage over the opposing party." The Court held: "The record also reflects that the Firm attempted to

manipulate the process to its advantage, and this is precisely the kind of inherent unfairness that constitutes prejudice under federal and state law." *Id.* at 656.

In the case before this Court, Cash Biz ignored the arbitration clause that it created and forced its customers to sign, and filed criminal charges against its customers to collect on debts. Cash Biz used criminal charges, threatened to send people to jail, had arrest warrants issued, and even sent people to jail to collect on a civil debt. In *Holmes Woods & Diggs*, the law firm obtained a default judgment and the Court held that the law firm "manipulated the process to its advantage" and its actions constituted "inherent unfairness". *Id.* at 656. If obtaining a default judgment constituted manipulating the process and inherent unfairness, then filing criminal charges and sending people to jail certainly constitutes manipulation of the system and inherent unfairness.

In *Petroleum Pipe Americas Corp. v. Jindal Saw, Ltd.,* 575 F.3d 476 (5th Cir. 2009), the Fifth Circuit held the defendant had substantially invoked the judicial process by waiting to move to arbitrate until after the trial court made pronouncements in a pretrial hearing that it favored the plaintiff's interpretation of a contract at issue in the case. *Id*. at 482. The

court held "A party waives arbitration by seeking a decision on the merits before attempting to arbitrate." *Id*. at 480-81.

Cash Biz filed criminal charges to seek a decision on the merits of the debts owed. Cash Biz did not want to go through the effort of individually arbitrating each claim, so instead it filed easy and cheap criminal charges seeking a resolution of the debts owed. (CR, 157-159, 186-245). Now, when faced with punishment in a civil lawsuit, Cash Biz is trying to hide behind the arbitration provision it happily ignored. Cash Biz knew it was difficult for people borrowing $300 to go to individual arbitration so it ruined the lives of thousands of people without fear of punishment.

For example, Christina McHan, who failed to repay a $200 loan from Cash Biz in Houston, was arrested, assessed $305 in additional fines and court costs and spent a night in jail because of Cash Biz's false allegation of check fraud. (CR, 140-141, Appendix 2). Hiawatha Henry was wrongfully charged with issuance of a bad check by Cash Biz, there was a pretrial conference, and there was a bench trial at which she had to defend herself. (CR, 186-197). Jason Hetrick was wrongfully charged with issuance of a bad check by Cash Biz, there was a bench trial without him, he was convicted, he was fined $150, and a warrant was issued for his arrest. (CR, 213-217) Mark Wilks was wrongfully charged with issuance of a bad check

17

by Cash Biz, there was a bench trial without him, he was convicted, and a warrant was issued for his arrest. (CR, 218-222). Brenda Tyler was wrongfully charged with issuance of a bad check by Cash Biz, there was a bench trial without her, she was convicted, and a warrant was issued for her arrest. (CR, 223-227). Janet Johnson was wrongfully charged with issuance of a bad check by Cash Biz, there was a bench trial without her, she was convicted, and a warrant was issued for her arrest. (CR, 228-232).

These criminal charges are still on the records of the people Cash Biz wrongfully prosecuted. These convictions will show up on background checks performed by potential employers, by courts in custody disputes, and on credit checks. There are thousands of similar instances of Cash Biz substantially invoking the litigation process by filing criminal charges against its customers. (CR, 233-245). There is no dispute Cash Biz was attempting to collect on the debt it was owed and to do so it substantially invoked the litigation process. *Williams Indus. Inc. v. Earth Development Sys. Corp.*, 110 S.W.3d 131, 139-40 (Tex. App. –Houston [1st Dist.] 2003, no pet.); *Petroleum Pipe Americas Corp. v. Jindal Saw, Ltd.,* 575 F.3d 476 (5th Cir. 2009).

Cash Biz argues "Appellees came forth with no evidence to controvert the affidavits from David Flanagan." Cash Biz wants this Court

18

to ignore the evidence, including numerous documents and articles, showing how Cash Biz actively participated in the criminal courts in an effort to illegally prosecute its customers for civil debts. Cash Biz claims "None of this constituted evidence to support waiver or prejudice." Because Cash Biz failed to object to any of this evidence, all of it constitutes evidence to support waiver and prejudice. *See* Tex. R. Evid. 103. Cash Biz failed to object to any of this evidence in their Motion, Reply or at the oral hearing. (SCR, 1-8, RR, 1-35). Recognizing it failed to properly object to the evidence, Cash Biz chooses to attack it instead.

Cash Biz wants this Court to ignore the evidence because it paints a startling picture of the lengths Cash Biz went to actively prosecute its customers in criminal courts across this state. Appellees presented evidence Cash Biz illegally filed, participated in, and prosecuted criminal charges against thousands of people in Houston, San Antonio, and Amarillo. (CR, 140-141, Appendix 2).

According to the investigation conducted by Texas Appleseed, Cash Biz filed the criminal charges, acted as the complaining witness, and collected "restitution" and fines. (CR, 151-159). Cash Biz also caused some borrowers to go to jail. (CR, 151-159).

According to Texas Appleseed, Cash Biz did not rely on prosecutors, but instead misled prosecutors by classifying these civil debts as bad checks. (CR, 151-159). Most of the counties in Texas have rules preventing prosecutors from taking these types of cases because they are not bad checks. (CR, 159). But Cash Biz would take these cases from court to court until a young prosecutor, who may not know better, would agree to accept the charges. (CR, 151-159). Then Cash Biz would file all of the charges in the one court where the prosecutor did not recognize Cash Biz was misleading them. (CR, 186-245). For example, all of the charges filed by Cash Biz in Harris County, almost 400 cases, are filed in Justice of the Peace for Precinct 4, Place 2 in Humble, Texas. (CR, 186-245). If Cash Biz was doing nothing improper, its representatives would not have to travel all the way to Humble, Texas to file every Houston case. (CR, 233-245). This pattern is identical in all other counties where Texas Appleseed received information. (CR, 157-158).

Appellees also presented uncontroverted evidence from Belinda Cinque, the clerk for the Justice of the Peace in Humble, Texas. (CR, 140-141, Appendix 2). Cinque said she discovered Cash Biz was improperly using the Court system to collect on civil debts by claiming the debts were bad checks. (CR, 140-141, Appendix 2). Cinque discovered the vast

majority of borrowers had either lost their jobs or had their hours reduced at work and was quoted as saying: "Correct me if I'm wrong, but they sound like sharks." (CR, 140-141, Appendix 2). Cinque told the Texas Observer she started getting calls from people, some in tears, making payments to Cash Biz through the court. (CR, 140-141, Appendix 2). She learned Cash Biz was "threatening them that they were going to be taken to jail." (CR, 140-141, Appendix 2). When she found this out, she told Cash Biz to stop filing hot-check complaints. (CR, 140-141, Appendix 2).

Does this sound like "Cash Biz merely submitted information of criminal activity to the district attorney" as alleged by Cash Biz? Appellees presented more than enough evidence to prove Cash Biz substantially invoked the judicial process. *See Williams Indus. Inc. v. Earth Development Sys. Corp.*, 110 S.W.3d 131, 139-40 (Tex. App. –Houston [1st Dist.] 2003, no pet.). But there is even more.

The Texas Office of Consumer Credit Commissioner ("OCCC") conducted an investigation into Cash Biz's activities and ordered Cash Biz to pay $10,000 in fines. (CR, 140-141, Appendix 1). At the end of the OCCC's investigation, Cash Biz admitted it improperly subjected its customers to criminal prosecution for failure to repay civil obligations. (CR, 140-141, Appendix 1). Eamon Briggs, assistant general counsel with the

21

OCCC, said they inform payday loan companies, such as Cash Biz, it is illegal to use the criminal justice system to collect civil debts and ask these companies whether they rely on the criminal justice system to collect civil debt. (CR, 140-141, Appendix 1). But according to Eamon Briggs "people don't always answer that question during the examination process truthfully." (CR, 140-141, Appendix 1). Because of Cash Biz's blatant dishonesty, the OCCC relies largely on consumer complaints, journalists, and information supplied by consumer advocacy groups like Texas Appleseed to catch violations. (CR, 140-141, Appendix 1).

Whether a party has waived arbitration must be decided on a case-by-case basis, based upon an examination of the totality of the circumstances. *See Perry Homes*, 258 S.W.3d at 591. The judicial process is substantially invoked when the party seeking arbitration has taken specific and deliberate actions, after the filing of the suit, that are inconsistent with the right to arbitrate **or** has actively tried to achieve a satisfactory result through litigation before turning to arbitration. *In re Vesta Ins. Group, Inc.,* 192 S.W.3d at 763 (emphasis added); *see also Pilot Travel Centers, LLC v. McCray*, 416 S.W.3d 168, 183 (Tex. App.—Dallas 2013, no pet.).

Cash Biz actively tried to achieve a satisfactory result in the collection of the debt through litigation (criminal prosecutions). Therefore,

22

Cash Biz substantially invoked the litigation process by filing criminal charges against Appellees. *In re Vesta Ins. Group, Inc.,* 192 S.W.3d at 763 (emphasis added); *see also Pilot Travel Centers, LLC v. McCray*, 416 S.W.3d 168, 183 (Tex. App.—Dallas 2013, no pet.).

Cash Biz's actions constitute a waiver of its right to enforce the arbitration clause. Because the class action waiver is contained in the arbitration clause, and is not an independent clause, then Cash Biz waived its right to assert the class action waiver as well. *See In re Online Travel Co.*, 953 F. Supp. 2d 713, 721 (N.D. Tex. 2013).

### A. Cash Biz Refuses to Accept Responsibility for its Illegal Activities Until it is Forced to Admit Responsibility

In the same way Cash Biz refused to admit it did anything wrong until the OCCC investigated its actions, Cash Biz still refuses to admit its substantial involvement in the prosecution of its customers. But that is not really a surprise considering Cash Biz even refuses to admit it even filed criminal charges at all. For example, in Appellants' Brief, it claims: "Cash Biz, could not, and did not initiate or procure any prosecution of any of its customers." (Appellants' Brief page 4). Cash Biz's counsel even attempted to make this argument at the oral hearing:

23

THE COURT: Let me ask a quick question. Tell me how it is that you feel the justice system was not invoked by submitting a criminal complaint.

MR. ARORA: We didn't submit a criminal complaint, your Honor. All we did was notify the district attorney that there may be criminal action by some of these plaintiffs.

(RR, 25, lines 11-17).

Both Texas Appleseed and the Texas Observer learned during their investigations Cash Biz initiated the criminal prosecutions and submitted criminal complaints against its customers. (CR, 151-159, Appendices 1 & 2). Even ignoring this, the policies and procedures of the Courts where the criminal charges were filed require the submission of a criminal complaint before the district attorney will even consider criminal charges in bad check cases.

For example, in Bexar County, where Cash Biz filed hundreds of criminal complaints against its customers, the only way the district attorney will consider criminal charges is if the complaining party does the following:

The Complaint Form - (Download the complaint form in PDF form) Complete the worthless check

> information form with as much information as possible on the check writer and transaction in duplicate form.
>
> Documentary Evidence - You will need to submit the original check(s), a copy of any correspondence you sent, a copy of any invoices, work order, or cash register receipts regarding the transaction of the check writer. Please make all necessary copies of documentary evidence for your records before submitting your complaint.[1]

In Harris County, the only way the district attorney will consider a bad check case is if the complaining party fills out a complaint and an affidavit of probable cause:

> The complaint must be accompanied by an Affidavit Stating Probable Cause. The affidavit is a written statement containing enough facts about the transaction to cause the magistrate to believe that the check writer has indeed issued a bad check, and is necessary to allow the magistrate to issue a warrant ordering the arrest of the check writer.[2]

From the evidence presented in this case, it is clear Cash Biz initiated the prosecution of its customers, submitted a formal complaint, **<u>and</u>** submitted an affidavit of probable cause. In the court records from Justice of the Peace for Precinct 4, Place 2 in Humble, Texas, Cash Biz was the "Complainant" in every case filed in Harris County. (CR, 186-245).

---

[1] *See* http://home.bexar.org/da/checks.html
[2] *See* http://www.jp.hctx.net/checks/info.htm

The trial court, recognizing that Biz was not being forthcoming, questioned Cash Biz's attorney at the oral hearing where Cash Biz eventually had to admit it did initiate the prosecution of its customers and did file criminal complaints against their customers:

THE COURT:    But there has to be an initiated – initiation of proceedings, whether it's – and it doesn't mean going to the police department. You can go to the hot check section, fill out the paperwork that says, I received this bad check for this amount, and that's it. Right there you've initiated.

So, are you telling me Cash Biz – Cash Biz didn't do that?

MR. ARORA:    Cash Biz – my understanding, that Cash Biz, when they received that information, they – all they did was hand it over to the DA's office. They called the DA's office and said, this is the criminal activity.

THE COURT:    Hand what over?

MR. ARORA: And that's it. Hand over whatever information that they had on evidence, the transaction history, what the –

THE COURT: The bad check.

MR. ARORA: Whatever the check was.

THE COURT: The form complaint.

MR. ARORA: Handed it to them. Now the district – and that's when – that's when we cut off our communication with the DA.

(RR, page 28, line 15 – page 29, line 12).

A "stipulation" is an agreement, admission, or concession made in a judicial proceeding by the parties or their attorneys respecting some matter incident thereto. *Shepherd v. Ledford*, 962 S.W.2d 28, 33 (Tex. 1998). Cash Biz's counsel ultimately stipulated Cash Biz initiated prosecution of its customers and filed formal complaints. (RR, page 28, line 15 – page 29, line 12).

The stipulation by Cash Biz's counsel directly contradicts the affidavit of David Flanagan, the only piece of evidence relied on by Cash Biz regarding its actions in the criminal prosecutions. According to David Flanagan, "Cash Biz did not initiate any prosecution of any of its

customers." (SCR, 10). But David Flanagan does not stop there: "Cash Biz did not make any formal charges, did not participate in any criminal trial, and did not obtain criminal judgments." (SCR, 10). Cash Biz's stipulation during the oral hearing proves David Flanagan's sworn statement is untruthful. (RR, page 28, line 15 – page 29, line 12). According to Cash Biz's counsel, Cash Biz did initiate prosecution of its customers and did make formal charges. *Id*.

David Flanagan's lack of credibility is apparent from this contradictions as well as other issues with his affidavit. For example, David Flanagan is from Ohio and fails to explain how he knows the extent of Cash Biz's involvement in the criminal cases filed in Texas.

Cash Biz next argues "An individual cannot procure or initiate a criminal prosecution in Texas." (Appellants' Brief, page 27). This is simply not correct, and the cases cited by Cash Biz to support this claim actually hold that an individual can procure or initiate a criminal prosecution.

All of the cases relied by Cash Biz on this issue cite to the law set forth in *Browning-Ferris*, which holds:

> A person procures a criminal prosecution if his actions were enough to cause the prosecution, and but for his actions the prosecution would not have occurred. A person does not procure a criminal prosecution when the decision whether to prosecute is left to the discretion of another,

28

including a law enforcement official or the grand jury, unless the person provides information which he knows is false. A criminal prosecution may be procured by more than one person.

*Browning-Ferris Indus., Inc. v. Lieck*, 881 S.W.2d 288, 293 (Tex. 1994).

As set forth above, bad check cases are not like other criminal charges and are not the decision of an officer or prosecutor. This is evidenced by the fact the complainant has to fill out an affidavit of probable cause. Even if bad check cases required a decision by the prosecutor, which they do not, a criminal prosecution is procured as a matter of law if the complainant provides false information. *Browning-Ferris Indus., Inc. v. Lieck*, 881 S.W.2d 288, 293 (Tex. 1994).

Cash Biz falsely characterized civil debt as bad check cases. (CR, 151-159). Cash Biz provided false information to the prosecutors and courts in order to try to collect on civil debts. (CR, 151-159). Cash Biz procured criminal convictions as a matter of law. *See Browning-Ferris Indus., Inc. v. Lieck*, 881 S.W.2d 288, 293 (Tex. 1994). Therefore, Cash Biz's argument it could not procure or initiate a criminal prosecution fails. *Id*.

## B. There is Texas Case Law Supporting Waiver

Cash Biz argues this is a case of first impression and there is no Texas case law specifically addressing its waiver. Cash Biz ignores Texas case law

and instead relies on distinguishable, and mostly unpublished, cases from other states.

In *In re Christus Spohn Health Sys. Corp.,* Debra Slough worked as a nurse at Christus Spohn Shoreline Hospital. *In re Christus Spohn Health Sys. Corp.*, 231 S.W.3d 475, 481 (Tex. App.—Corpus Christi 2007, no pet.). Jesus Alvarez abducted Slough from Christus Spohn's parking garage and murdered her. Debra Slough's husband, Corey Slough, filed suit against Christus Spohn individually and on behalf of their three minor children. During the criminal case of Jesus Alvarez, Christus Spohn moved to hold Alvarez's counsel in contempt of court based on alleged discovery abuse in an attempt to acquire evidence to help Christus Spohn defend the civil case. In holding that Christus Spohn waived its right to arbitrate because it substantially invoked the judicial process, the Corpus Christi Court of Appeals held that Christus Spohn's actions in the separate criminal matter was evidence in support of waiver:

> Accordingly, we construe Spohn's actions in this separate lawsuit as part of its strategic plan of defense in the underlying matter that would be inconsistent with a right to arbitrate.

*Id.* at 481.

When you combine the holding in *In re Christus Spohn Health Sys. Corp.,* with the language in Cash Biz's arbitration clause which says all

disputes, including criminal claims, are to be resolved in arbitration, it is clear this Court can hold Cash Biz substantially invoked the judicial process by filing criminal charges against its customers. (CR, 85 and RR, 13, lines 2-10).

Cash Biz ignores Texas law and relies heavily on cases from other jurisdictions that are factually and legally distinguishable. For example, in *Consorcio Rive*, the Court could not even consider the waiver argument made because waiver was not a defense to arbitration under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards:

> Waiver of the right to arbitrate is not among the seven defenses to enforcement of a foreign arbitral award set forth in the Convention. Thus, as a matter of law, defendant's argument that the arbitration award should not be enforced by this Court because plaintiff waived it is unavailing.

*Consorcio Rive, S.A. de C.V. v. Briggs Of Cancun, Inc.,* 134 F. Supp. 2d 789, 795 (E.D. La. 2001).

In *Griffin v. Burlington Volkswagen, Inc.*, the issue of substantially invoking the judicial process is not even addressed and a waiver argument is only mentioned by the New Jersey District Court but not analyzed because it is "clearly without merit." *Griffin v. Burlington Volkswagen, Inc., 411 N.J. Super.* 515, 517, 988 A.2d 101, 102 (App. Div. 2010).

31

Cash Biz also relies heavily on *Prescott-Follett*, an unpublished federal case from Louisiana District Court. *See Prescott-Follett & Associates, Inc. v. Delasa/Prescott Follett & Associates*, CIV.A. 01-3178, 2002 WL 31528463 (E.D. La. Nov. 8, 2002). Cash Biz manipulates the language of *Prescott-Follett* to make it appear as if that case is on point. It is not. In *Prescott-Follett*, the dispute was between Prescott–Follett and Delasa/Prescott, two companies litigating over the operating agreement entered into by both companies. *Id*. After the operating agreement litigation commenced, Delasa/Prescott filed charges in Nicaragua against Talavera and Wheelock, shareholders of Prescott–Follett, for theft. *Id*. Neither Talavera nor Wheelock were parties to the operating agreement lawsuit, neither were signatories to the operating agreement containing the arbitration clause, and their criminal charges in no way related to the operating agreement which contained the arbitration clause. *Id*.

In *Prescott-Follett*, the court held the filing of criminal charges against Talavera and Wheelock, two non-parties and non-signatories, could not substantially invoke the judicial process because they were non-parties:

> Accordingly, the Court fails to see how litigation against a non-party to an agreement can result in a waiver of arbitration rights pursuant to that agreement. Further, defendants' actions in filing proceedings against Talavera for theft of funds could not have resulted in any detriment or

32

prejudice to plaintiffs with respect to this action. Plaintiffs were not even parties to the litigation against Talavera and did not have to bear the expense of burdensome litigation. Plaintiffs' claims against defendants for breach of the operating agreements are unrelated to any claims against Talavera, individually, for alleged theft of funds. Consequently, the Court finds that any proceeding by defendants against Talavera, whether civil or criminal, did not result in a waiver of arbitration rights in this matter. See *Subway,* 169 F.2d at 328 (holding that franchisor did not waive right to arbitration under franchise agreement by filing previous lawsuit against franchisees where the earlier action involved claims that were different from the one the franchisor now sought to arbitrate); *Amalgamated Local No. 55, United Automobile, Aerospace & Agricultural Implement Workers of America v. Metal and Alloy Division of Silver Creek Precision Corporation,* 396 F.Supp. 667, 670 (N.D.N.Y.1975)(finding that union did not waive arbitration under collective bargaining agreement by filing criminal charge against one of employer's officers where criminal action was based upon different issues than those before the court and was brought against an individual and not the defendant corporation).

*Prescott-Follett & Associates, Inc. v. Delasa/Prescott Follett & Associates*, CIV.A. 01-3178, 2002 WL 31528463, at *4 (E.D. La. Nov. 8, 2002).

*Prescott-Follett*, and the cases relied on by the court, hold that filing criminal charges against non-parties and non-signatories does not substantially invoke the judicial process. In this case, Cash Biz filed criminal charges against Appellees, who are both parties and signatories to

the contracts. Further, *Prescott-Follett*, holds if the criminal charges are for specific claims "it subsequently wants to arbitrate" then it could substantially invoke the judicial process. *See Prescott-Follett & Associates, Inc. v. Delasa/Prescott Follett & Associates*, CIV.A. 01-3178, 2002 WL 31528463, at *4 (E.D. La. Nov. 8, 2002). That is exactly what Cash Biz did in the criminal courts of Texas.

### C. **Cash Biz's Illegal Activities Prejudiced Appellees**

Cash Biz, in not even addressing Appellees' prejudice, stipulates Cash Biz caused actual prejudice to Appellees. Cash Biz could not address prejudice because the record is clear Appellees were prejudiced. (CR, 186-245). Appellees incurred costs and fees in the criminal court. (CR, 186-245).

Any evidence of costs or fees incurred by a party is evidence of actual prejudice. *See Southwind Group, Inc. v. Landwehr*, 188 S.W.3d 730, 737 (Tex. App. –Eastland 2006, orig. proceeding). The evidence attached shows Appellees incurred substantial fines, court costs, and fees as a result of Cash Biz's improper criminal actions for civil debts. (CR, 186-245).

### **PRAYER**

Cash Biz knowingly violated Sections 393.201(c) and 393.201(c) of the Texas Finance Code and is attempting to avoid punishment by relying

34

on the arbitration clauses and class action waivers it forced its customers to sign. Based on the evidence presented, it is clear the arbitration clause and class action waiver relied on by Cash Biz are not applicable in this case and Cash Biz's request to enforce the arbitration clauses and class-action waivers should be denied. Further, Cash Biz waived its right to arbitration by substantially invoking the judicial process when it filed criminal charges against Plaintiffs, participated in criminal trials, obtained criminal judgments, threatened to send people to jail, sent people to jail, and attempted to collect from Plaintiffs.

For these reasons, Appellees ask this Court to affirm the trial court's order denying Cash Biz's application to compel arbitration and to enforce class action waiver.

Respectfully Submitted,

HANSZEN LAPORTE

 /s/ Daniel R. Dutko
DANIEL R. DUTKO
State Bar No. 24054206
11767 Katy Freeway, Suite 850
Houston, Texas 77079
(713) 522-9444 phone
(713) 524-2580 fax

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 9.4(i)(2)(B) of the Texas Rules of Appellate Procedure, the undersigned certifies this Brief complies with the Rule's word limits. The word count of the Brief from page 1 through page 30 is 7,504 words, excluding the parts of the brief exempted by Rule 9.4(i)(1). This word count is based on the count provided by the "word count" function of Microsoft Word 2010, which is the computer program used to prepare this Brief.

## CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2015, a true and correct copy of the foregoing was sent by E-service in accordance with TEX. R. CIV. P. 21a(a)(1) in accordance with TEX. R. CIV. P. 21a to the following counsel of record:

Sumit K. Arora
Edward S. Hubbard
Coats Rose
9 Greenway Plaza, Ste. 1100
Houston, Texas 77046

/s/ Daniel R. Dutko
Daniel R. Dutko



News     Cultur  □  □  □es     Subscribe

**DONATE NOW**

# State Punishes Payday Lender for Criminalizing Debt



Canisters of radioactive waste awaiting burial at the Waste Control Specialist site. *Courtesy of WCS*

*Courtesy of Taber Andrew Bain via Flickr*

A year and a half after the *Observer* documented hundreds of examples of payday loan companies using the



by Forrest Wilder
@Forrest4Trees

Published
Wed, Apr 22, 2015
at 11:35 am CST

criminal justice system to pursue unpaid loans, state regulators have taken action against one company. In December, the Office of Consumer Credit Commissioner ordered Ohio-based Cash Biz to pay a $10,000 fine and provide more than $16,000 restitution to 51 customers the company filed criminal

complaints against. In a legal filing obtained by the *Observer*, Cash Biz, which has 16 Texas locations, agreed that it had "referred its customers for prosecution based on an erroneous belief that a person commits a crime by issuing a check that is later dishonored."

State law prohibits payday and title loan businesses from even threatening borrowers with criminal action, except in unusual circumstances. And the Texas Constitution states plainly that "no person shall ever be imprisoned for debt." Nonetheless, many local DAs and justices of the peace serve as de facto debt collectors for the industry, and some people with small payday debts have ended up in jail. Payday and title lenders in Texas can effectively charge unlimited fees for loans, which often carry APRs of 500 percent or more. In December, Texas Appleseed released a report documenting more than 1,500 criminal complaints filed by 13 different payday loan companies since 2012. Many resulted in fines, arrest warrants and even jail time.

Eamon Briggs, assistant general counsel with the Office of Consumer Credit Commissioner, said this was the first time the agency had penalized a company for the practice.

"This certainly appears to be a growing trend and we're working to make sure our licensees know they can't be making these referrals unless they have specific concrete evidence of fraud, forgery or other criminal conduct," Briggs said. "It's

simply not permissible or within the intent of this prohibition to allow [payday and title lenders] to make referrals and simply rely on the DA to decide whether or not there are merits to the claim. We're working to make sure everyone knows that this is not an acceptable practice."

Briggs said OCCC asks lenders during an examination process whether they rely on the criminal justice system to collect on bad debt. But "people don't always answer that question during the examination process truthfully." The agency relies largely on consumer complaints and information supplied by consumer advocacy groups like Texas Appleseed to catch violations.

Ann Baddour, of Texas Appleseed, said she was pleased that OCCC had taken action against Cash Biz but said the punishment fell short.

"It's not sufficient because it doesn't address any of the detrimental impacts it had on these individuals," she said. "It doesn't expunge that charge from their record" or fix damaged credit scores. "It's basically a refund at value, there's no additional penalty." It also doesn't consider how much Cash Biz might have gained financially from threatening customers who made payments directly to the company but not a DA's office.

"It does seem like me that it's not a sufficient penalty to create a disincentive for this behavior," Baddour said.

OCCC says it's looking into 13 other payday companies documented by Texas Appleseed as filing criminal complaints against customers. But despite the attention by regulators—not to mention the fact that the practice is illegal—it continues.

The agency and consumer advocates want the Legislature to clarify, again, that criminalizing payday debt is not allowed. Several bills would do that but only one—Senate Bill 1650 by Sen. Kevin Eltife (R-Tyler), considered the weakest—has even gotten a hearing. House Bill 3058, by Rep. Helen Giddings (D-Dallas), would put the prohibition in the Penal Code and allow both consumers and the Texas attorney general to sue a wayward lender.

Giddings says her measure is needed to "protect citizens that are being taken advantage of by these predatory lenders."

But even something that simple, and relatively uncontroversial, is difficult to move through the Legislature. The Giddings bill is not among a handful of consumer loan bills being heard by the House Investments & Financial Services Committee on Wednesday. Lawmakers seem loath to touch anything that has to do with payday lending after back-to-back sessions that featured nasty, and ultimately unsuccessful, efforts to bring any regulation to the $5 billion industry.

"There's not a desire to pass any meaningful payday bills" this session, said Baddour.

Forrest Wilder, a native of Wimberley, Texas, is the editor of the *Observer.*

Read More: jail, payday loan, title loan

 Load 6 Comments

## You May Also Like:



### Texans Wait Longer for Abortion Care as Clinics Close

by Alexa Garcia-Ditta



### State: Birth Certificate Lawsuit a Ruse to Validate Foreign ID's

by Andrea Grimes



### Sexism, Stigma and Susan Hawk: Let's Find a New Way to Talk About the Dallas DA

by Amy McCarthy

## Popular Articles Now:

 **1**  **State: Birth Certificate Lawsuit a Ruse to Validate Foreign ID's**

**2**  **Texas' Other Death Penalty**

**3**  **Unearthing a Lost World**



News          Cultu    ☐ ☐ ☐es          Subscribe

**DONATE NOW**

# Fast Cash: How Taking Out a Payday Loan Could Land You in Jail

*Payday loan companies have a new debt-collection tool: Texas courts and prosecutors.*



by Forrest Wilder
@Forrest4Trees

Published

Tue, Jul 16, 2013
at 11:49 am CST



*Jen Reel*

Speedy Roo, the mascot of the payday loan lender Speedy Cash, in an Austin advertisement.

**When Roger Tillman** lost his job, he knew money would be tight. But he never thought he could end

up in jail for being broke.

Tillman's job as a late-night security guard in Houston had paid $9 an hour, and by picking up extra shifts, Tillman could just afford rent, groceries and other bills. But in 2008, amid the economic collapse, the security company scaled back overtime shifts, straining his finances. Worried that he couldn't pay his bills, Tillman reluctantly went to The Money Center, a payday loan company with locations in San Antonio and Houston.

He took out a $500 loan. The 64-year-old Houstonian doesn't recall the exact terms of the loan, but The Money Center's website currently offers a $500 loan at 650 percent annual interest, or about $150 in fees and interest for a two-week loan. Such terms are common in Texas, where payday and car title lenders are allowed to charge customers unlimited fees.

Like many low-income borrowers, Tillman found he couldn't fully pay off the loan when it came due. Instead, the lender offered to roll it over for another two weeks and tack on another round of fees. Tillman took on more payday loans to pay off the original loan and soon found himself in deepening debt. And then, in October 2009, he was laid off.

Tillman said he lost his job on a Wednesday and by Friday he was calling The Money Store to ask for an extended payment plan. No one called back. With his bank account empty and hoping to avoid overdraft fees, Tillman halted the automatic withdrawals he had set up for monthly payments on his payday

loans. Eventually, he reached a manager at The Money Store.

"His statement was that 'I hope you don't get stopped by the police, because I'm filing a theft by check charge against you,'" Tillman said. "I didn't say anything. I was floored, because I was expecting to work out a payment plan."

It was no idle threat. In November 2009, The Money Center, which is the operating name for a company called Marpast of Texas, filed a criminal complaint against Tillman with the Bexar County district attorney in San Antonio. Tillman soon received a letter from the DA, demanding that Tillman pay Marpast $1,020 within 10 days or potentially face felony theft charges that carry two to 20 years in jail and fines up to $10,000. In all, the district attorney demanded $1,250, including "district attorney fees" of $140 and merchant fees of $90.

Tillman was shocked and scared. When his daughter graduated from basic training at Lackland Air Force Base in San Antonio, Tillman almost didn't attend out of fear that there was a warrant for his arrest in San Antonio.

"I'm innocent here," he said, "other than losing my job and an inability to pay. I tried to get on a payment plan. If my intention was to duck and dodge, why would I even call them?"

In Tillman's case, however, the debt collectors weren't exactly

lying: He could be arrested for not paying his payday loan debt.

An *Observer* investigation has found at least 1,700 instances in which payday loan companies in Texas have filed criminal complaints against customers in San Antonio, Houston and Amarillo. In at least a few cases, people have ended up in jail because they owed money to a payday loan company. Even when customers avoided jail, the *Observer* has found, payday loan companies have used Texas courts and prosecutors as de facto collection agencies.

This is despite state laws that forbid payday loan companies from even *threatening* to pursue criminal charges against their customers, except in unusual circumstances. The law specifically prohibits theft charges when a post-dated check is involved. (Most payday loans require borrowers to provide a post-dated check or debit authorization to get the money.) The state Office of Consumer Credit Commissioner has advised the payday loan industry that "criminal charges may be pursued only in very limited situations" where it can be proven that a borrower knew a check would bounce.

The Consumer Service Alliance of Texas, a trade association representing 80 percent of Texas' payday and title loan companies, is even more strict about the practice. "Members will not threaten, or pursue, criminal action against a customer as a result of the customer's default on a credit service

agreement," according to the group's website.

"I think the idea of debtors' prison is offensive to most people and that's why we have prohibited this in the law," said Ann Baddour of Texas Appleseed, an Austin-based organization that advocates for the poor. "It's clearly established in the law that unless there's criminal intent on the part of the borrower, there's not an option to pursue criminal charges."

Still, payday lenders have found courts and prosecutors willing to take cases. The practice threatens to jail people for debt.

**Until debtors' prisons** were banned 180 years ago, Americans could be jailed for years for owing just a few pennies. The costs of incarceration, though minimized by squalid prison conditions, often grossly exceeded the debts, suggesting that punishment was the overriding motive.

In the first two decades of the 19th century, humanitarians confronted authorities in several states with a litany of abuses, and the public came to see the practice of jailing debtors as repugnant. New York was the first state to abolish incarceration for debt. Other states followed, and Congress passed a federal statute banning the practice in 1833.

The Republic of Texas Constitution, drafted just a few years later, in 1836, establishing Texas as an independent nation, declared, "No person shall be imprisoned for debt in

consequence of inability to pay."

In some respects, Texas law tilts strongly toward debtors' rights. Texans' property is largely shielded from seizure by creditors. Wages can't be garnished for consumer debt.

But it's nonetheless increasingly common for people to be arrested for unpaid debts, including in Texas. In 2011, *The Wall Street Journal* reported that more than a third of states allow borrowers who can't or won't pay debts to be jailed, even in states that prohibit debtors' prisons. Debt-collectors and other financial firms, the newspaper reported, are suing borrowers over unpaid credit cards, consumer loans, auto loans and other debts. Many people report never receiving a notice of the lawsuit and end up with an arrest warrant obtained through the courts. However, in Tillman's case and others in Texas, some payday lenders have found an even more direct way to harness the power of the criminal-justice system.

The *Observer* has found a justice of the peace in Harris County who has handled almost 300 hot-check cases, a Class C misdemeanor, for Cash Biz, an Ohio-based payday lender with 24 locations in Texas. Though Class C misdemeanors rarely carry jail time, at least a few people have served time in the Harris County jail to work off their debt, at $300 a day.

Christina McHan failed
to repay a $200 loan



from Cash Biz near Houston. In November 2012 she was arrested, pleaded guilty, and was assessed $305 in additional fines and court costs. She spent a night in jail to "pay off" the debt.

In Amarillo, the wife of a military veteran with 23 years of service complained to the Office of Consumer Credit Commissioner that the Potter County Attorney was pursuing theft charges against her husband even though the couple was in bankruptcy. "My husband is a good man!" she wrote to the credit commissioner. "He has never done anything wrong, he fought for this country for 23 years … and now the Potty [sic] County Attorney wants to prosecute him for a payday loan."

In an emailed response to questions from the *Observer*, Assistant Potter County Attorney T. Eric Dobbs wrote that his office doesn't receive many cases from payday lenders, but the ones they do get typically involve a borrower who has closed their bank account after taking out a loan, or someone who "could not keep up with the recurring fees so they stopped

paying in hopes that a case will be presented to our office." Dobbs didn't respond to follow-up questions, including why a borrower would hope to face criminal prosecution.

Belinda Cinque, the hot-check clerk for Justice of the Peace Tom Lawrence in the Houston suburb of Humble, said she has little choice but to take payday lenders' criminal complaints. "If all of the elements match, I've got to take it," she said. But she expressed discomfort with the situation, noting that the vast majority of borrowers had either lost their jobs or had their hours reduced at work. "Correct me if I'm wrong, but they sound like sharks," Cinque told me. At some point last year, she started getting calls from people—some in tears—making payments to Cash Biz through the court. A collection agency was "threatening them that they were going to be taken to jail," Cinque said. To her, it sounded like the debt was being collected from two directions—a debt-collection company and through the court. She told Cash Biz to stop filing hot-check complaints as long as the company was using debt collectors.

The court, Cinque said, gives borrowers as much time as possible to pay and tries to avoid issuing warrants.

Almost all of the cases in Lawrence's Harris County court emanate from Cash Biz, which appears to have found a way around the prohibition on prosecuting "held" or post-dated checks. Most payday loan companies in Texas have their customers fill out a post-dated check or authorize an electronic

debit from a checking account for a future date. When the loan is due, the company either cashes the check or debits the account. That is, unless the customer doesn't have the money and wants to "roll over" the loan. Cash Biz, on the other hand, gets checks from their customers dated for the day of the transaction. If the customer doesn't come in and pay on the loan before the due date, the company can try to cash the check. If it bounces, then the company claims it has the basis for a hot-check charge. (Reached by phone, Cash Biz President David Flanagan said he would have someone else in the company call me back. No one did.)

Baddour, the consumer advocate, said that Cash Biz's "innovation" points to a persistent problem with the payday loan industry in Texas.

"What we've seen over and over again is that [payday lenders in Texas] are pushing the limits of the law, always finding the loopholes, finding ways to navigate through the law," she said.

Still, it's not clear that the Cash Biz model is kosher. Taking out a payday loan isn't like writing a hot check for groceries. Regardless of when you date the check, you're borrowing money because you don't have any. The promise is that you will eventually pay the money back with interest. In the payday loan model, the check is security for the loan, not payment.

Asked about the Cash Biz prosecutions in Harris County, Rudy

Aguilar, director of consumer protection for the state Office of Consumer Credit Commissioner, responded, "We don't believe that it would be appropriate in that scenario to move forward with those charges," he said. "Now, we can't tell that J.P. court how to interpret this." Aguilar said the agency was unaware that the justice of the peace court in Humble was pursuing criminal charges against Cash Biz customers.

Defense attorney Jeff Ross, who specializes in hot-check cases in Houston, said that payday loan customers aren't committing a crime, because the payday lender accepts the check knowing that it's not good at the time the loan is given.

"If I want to be a hard-ass about it I'd say, 'Listen we're not going to pay a nickel,'" Ross said. "This doesn't even belong in this court. It's a hold check and therefore it's not a criminal case." While he doesn't see anything patently illegal about the JP court's practice, the intent is clear. "The payday loan people file with the JP court and use them as muscle to collect their money."

**As Roger Tillman began** looking into how to avoid jail time, he grew angry. He wrote letters to Marpast, the state Office of the Consumer Credit Commissioner and the Bexar County DA. His complaint to the credit commission triggered an investigation.

Marpast would later tell the state Office of Credit Consumer

Commissioner in writing that it had submitted the debt to the Bexar County DA "for collection purposes." Indeed, First Assistant District Attorney Cliff Herberg described the hot-check division as "an assembly line process" in which "the vast majority of [cases] don't get prosecuted."

So is the DA's office functioning as a debt-collection service for payday lenders?

"Well, we send a letter out," Herberg told the *Observer*. "That's part of the services that are offered." The DA, he said, can't decide which merchants to work with or not, even if "payday lenders may not be the favorite in the community."

Herberg said his office won't prosecute cases in which a payday loan is involved unless there's a clear case of fraud or deception. "If it's for a loan, they're not going to submit them to a criminal prosecution, it would be for collections purposes only." However, the collections letters from the Bexar County DA threaten arrest, jail and criminal prosecution—an inconsistency that the credit commission noted in its correspondence with Marpast.

"You would think that if this was a legitimate fraud or suspected fraud or suspected theft by check, that would've come up somewhere in the letter" from Marpast to the credit commission, Tillman said. "Because [Marpast] knew and the DA for that matter knew it was bullshit. It was an attempt to

collect on a debt by coercion."

There were other details that bothered Tillman. For one, the outstanding loans were for $500 and $350, respectively, not the $1,020 that Marpast was demanding. He also bristled at the thought that the Bexar County DA's office was profiting from its collections letters.

"When you multiply a $140 processing fee times a 1,000 or 2,000 or 3,000 people who are delinquent, that's a hell of a lot of money. That's a way of putting money in your coffers. And all you've got to do is put something down on your letterhead."

In all, the Bexar County DA has accepted more than 1,400 criminal complaints from payday lenders since 2009 totaling almost $373,000, according to records from the DA's office obtained by the *Observer*.

The Office of Credit Consumer Commissioner has occasionally told payday lenders to stop seeking criminal charges against customers, but the agency has no jurisdiction over judges or prosecutors. After Tillman wrote to the consumer credit commissioner in August to complain about his situation, the agency investigated. In a September letter to Marpast, the agency instructed the company to "advise the DA's office to cease collection activities on all checks" forwarded by Marpast. This should keep Tillman and other borrowers out of jail.

While the commission ordered Marpast to stop, its policing in general is spotty.

Since the Texas Legislature assigned the agency the duty of overseeing payday and title loans in 2011, it's been stretched thin. The consumer credit commission has 30 field examiners to cover 15,000 businesses, including 3,500 payday and title lenders.

"Although I'd love to take a bunch of folks and go at that one issue," said Aguilar, the director of consumer protection, "I don't have that luxury at the moment." Aguilar said his team finds violators when consumers complain or when the agency's examiners visit one of the stores for an inspection. Only two customers, including Tillman, have ever complained to the commission.

"It's a difficult situation," Aguilar said. "People get put in tough situations where they're just not armed with enough knowledge to deal with [payday lenders], and they get intimidated. If somebody calls you and tells you that you've violated the law in a criminal manner, that's going to get your attention and shake you up."

Forrest Wilder, a native of Wimberley, Texas, is the editor of the *Observer*.

Read More: jail, payday loan, title loan